1  JOSEPH J. PERKOVICH, ESQ.
   NY Bar No. 4481776
2  Phillips Black, Inc.
   PO Box 4544
3  New York, NY 10163
   Tel: (212) 400-1660
4  j.perkovich@phillipsblack.org

5  AMY P. KNIGHT, ESQ.
   AZ Bar No. 031374
6  Knight Law Firm, PC
   3849 E Broadway Blvd, #288
7  Tucson, AZ 85716-5407
   Tel: (520) 878-8849
8  amy@amyknightlaw.com

9  Attorneys for Frank Jarvis Atwood

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

TUCSON DIVISION

| | |
|---|---|
| Frank Jarvis Atwood,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>David Shinn, Director, Arizona Department of Corrections Rehabilitation & Recovery; James Kimble, Warden, ASPC-Eyman; Jeff Van Winkle, Warden, ASPC-Florence; Lance Hetmer, Assistant Director for Prison Operations, Arizona Department of Corrections Rehabilitation & Recovery,<br><br>　　　　Defendants. | CASE NO. _____<br><br>**COMPLAINT**<br><br>**This is a capital case.** |

1

# INTRODUCTION

1. Plaintiff Frank Jarvis Atwood has been a devout practitioner of the Greek Orthodox faith for over two decades. Although he is incarcerated on Arizona's death row, he observes a strict schedule of prayer and study at the direction of his priest, Father Paisios, Abbot of the St. Anthony's Greek Orthodox Monastery in Florence, who baptized him into the faith in July, 2000 and has visited and ministered to him regularly for many years despite, at different points, imposition by the Arizona Department of Corrections, Rehabilitation & Reentry ("ADCRR") of unlawful impediments.

2. Mr. Atwood's faith requires that when the State carries out his execution, Fr. Paisios be permitted to stay by his side and to pray and administer last rites, including placing his hands on him and speaking to him directly. In anticipation of the State seeking an execution date, Mr. Atwood asked ADCRR to accommodate this exercise of religion.

3. ADCRR denied this request, without explaining why it cannot accommodate Mr. Atwood's exercise of his religious beliefs. It will not even permit Fr. Paisios to be in the execution chamber, let alone touch Mr. Atwood or speak or pray aloud.

4. On April 7, 2022, the State filed a Motion for Warrant of Execution, the first such motion it has filed against Mr. Atwood, which is now pending in the Arizona Supreme Court pursuant to an April 5, 2022, scheduling order stating it is poised to rule on that motion in its May 3 conference. If the State's motion is granted, Mr. Atwood's execution would be scheduled 35 days later. Mr. Atwood is thus in danger of being executed in a manner that violates his rights under the U.S. Constitution and federal statute.

5. ADCRR's refusal to accommodate Mr. Atwood's religious beliefs contravenes the Establishment and Free Exercise Clauses of the First Amendment and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc, *et seq*.

6. Without relief, Mr. Atwood will suffer irreparable harm that is "spiritual rather than pecuniary," as "he will be unable to engage in protected religious exercise in the final moments of his life." *Ramirez v. Collier,* __ S.Ct. __, 2022 WL 867311 (March 24, 2022), Slip Op. at 18-19.

**JURISDICTION**

7. This court has jurisdiction under 42 U.S.C. § 2000cc-1, under 28 U.S.C. §§ 1331, 1343, 1651, 2201, and 2202, and under 42 U.S.C. § 1983.

**VENUE**

8. Venue is proper under 28 U.S.C. § 1391 because defendants reside in the District of Arizona. Venue is also proper because Plaintiff's execution will occur in this district and division, the division where Plaintiff is imprisoned.

**PARTIES**

9. Plaintiff Frank Jarvis Atwood is currently incarcerated by ADCRR under a sentence of death at the Browning Unit in the Arizona State Prison Complex – Eyman in Florence, Arizona. The State has sought a warrant for his execution, and that motion is pending in the Arizona Supreme Court.

10. Defendant David Shinn is the director of ADCRR. He is being sued in his official capacity. He is responsible for the oversight and enforcement of policies and procedures generally applicable to all prisons and all prisoners and is responsible for carrying out Mr. Atwood's execution.

11. Defendant James Kimble is the warden of ASPC-Eyman. He is being sued in his official capacity.

12. Defendant Jeff Van Winkle is the warden of ASPC-Florence. He is being sued in his official capacity.

13. Defendant Lance Hetmer is the Assistant Director for Prison Operations of ADCRR. He is being sued in his official capacity. Arizona's execution protocol charges him with "the planning and overall direction of all pre-execution, execution and post-execution activities."

**MR. ATWOOD'S FAITH**

14. Mr. Atwood is Greek Orthodox. His commitment to this faith is deep and sincere. He converted to Greek Orthodoxy in 2000, obtaining the Baptismal name of Anthony.

15. Mr. Atwood has devoutly practiced his faith consistently for the last 22 years, even during the better part of the past decade while he has endured severely debilitating pain and incapacitation as a result, largely, of the deliberate indifference of ADCRR officials and their agents responsible for his medical care in relation to Mr. Atwood's degenerative spinal condition that has rendered him wheelchair-bound. *Atwood v. Days, et al.*, 2:20-cv-623-JAT-JZB, *Order* (12/7/2021) (Doc. 173 at 8) (partially granting injunctive relief in *pro se*-initiated litigation establishing Mr. Atwood's likelihood of success on the merits in showing ADCRR's deliberate indifference). Exhibit A.

16. Mr. Atwood's devotion to his faith is so great that he has overcome largely incapacitating pain and disability to devote extraordinary time and effort to studying it, culminating in 2020 in a Doctor of Theology degree earned through a seminary that conducts remote instruction. He has also written several books about his faith, both under his given name and Baptismal name. Those books include *West of Jesus: Bible's Answer to the Protestant Departure from Orthodox Belief* (2007); *Spiritual Alchemy* (2010); and *The Gates of Hades Prevaileth Not: Heresies, Schisms, & Other Errancies Renounced by the Eastern Church* (2012). Another book co-written with his wife Rachel Atwood, *And the Two Shall Become One* (2018), describes his spiritual journey, conversion to Greek Orthodoxy, and longstanding relationship with Fr. Paisios.

17. Mr. Atwood also introduced his wife Rachel to Greek Orthodoxy, explaining the faith to her, and ultimately, she, too, was baptized into the Church in 2007. Their shared Greek Orthodox faith has become an important part of their marriage.

18. Mr. Atwood learned about Greek Orthodoxy when, after writing a letter to a church leader in Cyprus with questions about the religion, he was referred to Fr. Paisios in Florence. Fr. Paisios began visiting Mr. Atwood regularly, and it was Fr. Paisios who baptized him when he eventually converted in July, 2000.

19. Fr. Paisios has ministered to Mr. Atwood in person since 2000 via contact visits, where he performs the sacraments. No problem for the prison has ever arisen from these longstanding visits. However, Mr. Atwood has, at times, had to struggle to sustain his access to the sacraments and Fr. Paisios's visitation.

20. Mr. Atwood's insistence on physical access to Fr. Paisios and the sacraments is nothing new. He has consistently advocated for his right to practice various aspects of his religion. When, in 2012, after twelve years of regular contact visits to receive sacraments with Fr. Paisios, Mr. Atwood learned the prison intended to significantly curtail this access to religious services, he exhausted the grievance process and filed a lawsuit *pro se* (*Atwood v. Linderman, et al.,* CV-13-00174-PHX-JAT), resulting in an order that he be allowed two-hour religious visits from Fr. Paisios every other week that permitted him to participate in sacraments. When these visits were suspended in the COVID-19 pandemic, Mr. Atwood objected, and through the grievance process, explained to the prison that his religious beliefs still required visits with Fr. Paisios and the ability to participate in sacraments. He has also had to file grievances repeatedly over the denial of access to his religious property.

21. Fr. Paisios himself has also advocated for Mr. Atwood's religious needs and has directly contacted prison officials to request specific accommodations for Mr. Atwood. For

instance, in 2015, he wrote a letter requesting that the prison allow Mr. Atwood to possess the necessary items for his Holy Communion services and allowing him to wear his religious head covering.

22. Mr. Atwood's religious beliefs require that his priest be by his side during his execution to pray and administer last rites, including placing his hands on him and speaking to him directly. Specifically, in Greek Orthodoxy, the ritual known as last rites encompasses four sacraments: Confession, Communion, Holy Unction, and Service of Departure of the Soul. All four require physical presence of the priest. They include reading of prayers, direct communication between Priest and Penitent, and physical contact. The importance of preparation for death in the Orthodox Church is indisputable; St. Anthony's Greek Orthodox Monastery (of which Fr. Paisios is the Abbot), has even published a book on the subject, *The Departure of the Soul, According to the Teaching of the Orthodox Church* (2016).

23. ADCRR's history of struggle to conduct humane executions heightens the gravity of the violation of Mr. Atwood's right to religious exercise. ADCRR last attempted to execute a prisoner in 2014. ADCRR's lethal injection protocol at the time, which had passed judicial scrutiny, failed, causing a botched killing entailing 15 injections rather than the contemplated single lethal injection and transpiring for nearly two hours. During those two hours, the prisoner, Joseph Wood, was observed to gulp and gasp for air over 600 times. Mauricio Marin, *Witness to 2-hour Arizona execution: Joseph Wood gasped before he died*, The Guardian, July 24, 2014.

24. ADCRR adopted its current Execution Protocol in the aftermath of that 2014 tragedy, and the current competence of ADCRR to conduct a constitutional execution remains in question.

25. In this context, Mr. Atwood's need for his religious practices and spiritual

guidance during the execution process is heightened, both because this history itself creates significantly heightened anxiety for Mr. Atwood as he goes to his death fully aware of the fates suffered by his predecessors, and because it reveals a real risk that the execution will not succeed in humanely taking his life. Further, because Mr. Atwood has an extremely painful spinal condition, which has left him wheelchair-bound for many years, he is very vulnerable to enduring extreme, even maximum, pain levels throughout the process.

26. For the Greek Orthodox, last rites are more important in a death that is difficult than one that passes peacefully. Even if the foregoing risk of an inhumane and/or extremely painful execution were remote, the chance of either outcome make the presence of the spiritual advisor crucial, because it would be in such an eventuality that the need for Fr. Paisios's presence would be greatest. If Fr. Paisios were excluded and that did happen, there would be no repairing the spiritual damage done to Mr. Atwood in the final moments of his life.

**ARIZONA'S POLICY**

27. Arizona's execution protocol, known as Department Order 710, originally adopted June 13, 2017, and amended March 10, 2021 (the "Execution Protocol," Exhibit B), provides that the inmate may invite "two clergy and five other persons" to witness his execution. The clergy are not permitted any greater access than the inmate's other witnesses, who are required to remain in the witness room throughout the execution.

28. On March 16, 2021, after the State's March 5, 2021, announcement that it had secured a supplier of pentobarbital, the Federal Public Defender's Office in Phoenix, which represents several death-sentenced inmates eligible for execution, wrote to Defendant Shinn inquiring what process inmates should follow to designate a spiritual advisor, including having that spiritual advisor remain with them in the execution chamber. The Department's General Counsel, Brad Keogh, responded the next day, stating:

> [T]he provisions of DO 710. . . will be observed as with prior executions. As you acknowledge, the inmate is permitted to designate two clergy to provide spiritual counsel "leading up to their executions", and Form 710-2 provides for that designation. As long as the designated clergy pass a security background check, they will be allowed to so serve the inmate. If the inmate would like one of his designated clergy to personally minister to him during the execution process itself, then that one clergy will be allowed to remain *in the witness room, outside the execution chamber, wearing a microphone with which to communicate with the inmate. To be clear, no physical contact with the inmate will be permitted at any time.*

Exhibit C (emphasis added).

29. On June 16, 2021, counsel for Mr. Atwood wrote to General Counsel Keogh on behalf of Mr. Atwood, requesting information specifically about whether Fr. Paisios would be permitted contact visits with Mr. Atwood leading up to the execution and have "access within the given execution chamber or execution room to remain by Mr. Atwood's side to pray and administer last rites, including placing his hands on Mr. Atwood, if physically possible, as the execution is carried out." Exhibit D.

30. Two weeks later, on June 30, 2021, Mr. Keogh responded that "ADCRR answered these questions from the Federal Public Defender via correspondence dated May 17, 2021," and attached a copy of that letter. That was the extent of his response to Mr. Atwood's questions about accommodation of his religious beliefs. Exhibit E.

31. ADCRR's response to Mr. Atwood's request (as reflected in its response to other inmates' request, made in the abstract) was to refer to the provisions of its Execution Protocol. The current Execution Protocol does not contain procedures for accommodating a spiritual advisor inside the execution chamber.

32. The existence of consistent, written procedures—an Execution Protocol—has long been a crucial pillar of Arizona's position that it can carry out lethal injection in a constitutional manner. *See, e.g., Dickens v. Brewer,* 631 F.3d 1139, 1149 (9th Cir. 2011) ("[W]e

agree with Dickens that it is critical for Arizona to follow the procedures set forth in the Protocol when conducting an execution."). ADCRR has struggled to create, let alone comply with, an Execution Protocol that sufficiently protects inmates' constitutional rights.

33. Executing Mr. Atwood in a manner that does not comport with ADCRR's Execution Protocol, or any subsequent written protocol, would create an objectively intolerable risk of harm due to a lack of procedures contemplating who, as a spiritual advisor, is permitted to be where and when, and what such an advisor is permitted to do, risking miscommunication, error, and disruption of the execution process. As the Supreme Court advised in *Ramirez*:

> If spiritual advisors are to be admitted into the execution chamber, it would also seem reasonable to require some training on procedures, including any restrictions on their movements or conduct. When a spiritual advisor would enter and must leave could be spelled out. If the advisor is to touch the prisoner, the State might also specify where and for how long. And, as noted, if audible prayer is to occur, a variety of considerations might be set forth in advance to avoid disruption. It may also be reasonable to document the advisor's advance agreement to comply with any restrictions.

Slip Op. at 21 (citation omitted). Mr. Atwood is just as entitled to a carefully planned, practiced, and managed execution as any non-religious inmate or inmate whose religion does not require in-person last rites, direct speech, and physical contact.

**EXHAUSTION**

34. On January 2, 2022, Mr. Atwood submitted an informal complaint through the prison's complaint system, stating that his lawyers had been told Fr. Paisios would be allowed in the witness room only, and his "religious beliefs require Father Paisios to stay by [his] side during [his] execution and to pray and administer last rites, including placing his hands on [him] and speaking to [him]." Exhibit F.

35. On January 18, 2022, Mr. Atwood received a response that "710 – Execution Procedures 2.1.3.1.1 inform the inmate that two clergy and five other persons may be invited to

9

be present at the execution. Policy allows for clergy to be present as a witness during execution but does not give permission to allow clergy to be at your side during execution. Your request to have clergy at your side during execution cannot be resolved at my level." Exhibit G.

36. On January 19, 2022, Mr. Atwood filed a formal grievance, stating, "As stated in the Informal Complaint Resolution, my religious needs require that during my execution, and at the time of my death, that I am able to speak directly with my priest and am able to have him lay hands on me. ADCRR Dept. Order 710 fails to provide these essential religious necessities and therefore violates my constitutional (1st Amendment) and congressional (RLUIPA) rights to freely exercise my religion." Exhibit H.

37. On February 2, 2022, Mr. Atwood received a response to his grievance, stating that it was "unprocessed." The response explained, "This is in the ARS codes. Your Inmate Grievance for this case was unprocessed due to judicial proceedings or decision of the courts. You cannot submit a grievance appeal." Exhibit I.

38. In an abundance of caution, Mr. Atwood submitted an appeal anyway on February 6, 2022. He has received no response. Exhibit J.

39. Mr. Atwood has complied with all procedural rules and fully exhausted the administrative remedies that are available to him, satisfying the exhaustion requirement of the Prison Litigation Reform Act of 1995, 42 U.S.C. § 1997e(a).

**CLAIMS FOR RELIEF**

**No. 1: ADCRR'S EXECUTION PROTOCOL IS NOT NEUTRAL TOWARD RELIGION AND EVINCES A HOSTILITY TOWARD RELIGION GENERALLY, VIOLATING THE FIRST AMENDMENT'S ESTABLISHMENT CLAUSE.**

40. Mr. Atwood hereby realleges and incorporates by reference the preceding

paragraphs in this Complaint.

41. The First Amendment of the United States Constitution commands that "Congress shall make no law respecting an establishment of religion." U.S. Const., amend. I. This command is similarly binding on the states. *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940). The Establishment Clause of the First Amendment prohibits governmental entities from passing laws that demonstrate a hostility toward religion or that prefer one or more religions over others. *Larson v. Valente*, 456 U.S. 228, 246 (1982); *Zorach v. Clauson*, 343 U.S. 306, 313-15 (1952).

42. The Establishment Clause requires the State to be neutral *among* religions and *between* religion and non-religion. *See, e.g.*, *Lynch v. Donnelly*, 465 U.S. 668, 698 (1984); *Lemon v. Kurtzman*, 403 U.S. 602, 612 (1970); *see also Comm. for Public Ed. & Religious Liberty v. Nyquist*, 413 U.S. 756, 788 (1973) (noting that, to maintain an attitude of neutrality toward religion, government cannot "advance[]" or "inhibit[]" religion). Defendants' policy, expressly distilled into its current Execution Protocol (*supra* ¶ 26*), excluding all spiritual advisors from the execution chamber is not neutral. Inmates who adhere to no religion are neither harmed nor targeted by ADCRR's policy; inmates who do—whatever that religion may be—are.

43. A law or policy that is not neutral between religion and non-religion, like ADCRR's Execution Protocol, is inherently suspect, and strict scrutiny must be applied. *Larson*, 456 U.S. at 246. The policy can survive this level of scrutiny only if it is narrowly tailored to a compelling government interest. *Id.* at 247.

44. ADCRR has never explained what compelling interest its discriminatory policy could possibly serve. Indeed, it plainly serves none. This absence of a compelling government interest is especially true where, as here, the spiritual advisor is well known to ADCRR and has a decades-long history of uneventful service inside the prison.

45. Even if the blanket policy excluding spiritual advisors in ADCRR's Execution

Protocol did serve a compelling state interest, it is not narrowly tailored to that interest.

**No. 2: ADCRR'S POLICY UNJUSTIFIABLY INTERFERES WITH MR. ATWOOD'S ABILITY TO PRACTICE HIS RELIGION, VIOLATING HIS FIRST AMENDMENT RIGHT TO THE FREE EXERCISE OF RELIGION.**

46. Mr. Atwood hereby realleges and incorporates by reference the preceding paragraphs in this Complaint.

47. The First Amendment also commands that "Congress shall make no law … prohibiting the free exercise of" religion. U.S. Const., amend. I. Like the Establishment Clause, the Free Exercise Clause's command is binding on the states. *See Cantwell*, 310 U.S. at 303.

48. Proceeding under ADCRR's current Execution Protocol will prohibit Mr. Atwood's ability freely to exercise his religion. Specifically, it will prevent him from receiving his last rites and final prayers at the time of his death as his religious beliefs require.

49. The level of scrutiny to be applied when reviewing policies that hinder an individual's ability freely to exercise his religion depends on whether the law is neutral and generally applicable. As Justice Kennedy explained in *Church of the Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520 (1993), "a law that is neutral and of general applicability need not be justified by a compelling government interest even if the law has the incidental effect of burdening a particular religious practice." *Id.* at 531.[1] These laws need only be rationally related to a legitimate government interest. *South Bay United Pentecostal Church v. Newsom,* 985 F.3d 1128, 1140 (9th Cir. 2021). A law that does not satisfy both of these requirements "must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest." *Id.*; *see also Masterpiece Cakeshop v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1734 (2018)

---

[1] Congress has explicitly provided protection from such laws by subjecting them to strict scrutiny as a matter of statute in the Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. § 2000bb *et seq.* and the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. § 2000cc *et seq.*

12

1 (Gorsuch, J., concurring).

50. ADCRR's current Execution Protocol is not neutral because it evinces a hostility toward religion and thereby favors non-religious inmates over religious inmates. Accordingly, the policy is permissible only if it can survive strict scrutiny.

51. The blanket policy of excluding spiritual advisors in ADCRR's current Execution Protocol cannot survive strict scrutiny because it fails to serve any compelling government interest. This is especially true where, as here, the spiritual advisor is well known to ADCRR and has a decades-long history of uneventful service inside the prison.

52. Even if the current Execution Protocol's blanket policy excluding spiritual advisors did serve a compelling government interest, it is not narrowly tailored to that interest.

53. The current Execution Protocol's blanket policy excluding spiritual advisors cannot even survive the rational basis review applicable to neutral laws, because where the spiritual advisor is known to ADCRR and has a long history of uneventful service inside the prison, the blanket policy of exclusion is not rationally related to any legitimate government interest.

**No. 3: THE BLANKET POLICY EXCLUDING SPIRITUAL ADVISORS IN ADCRR'S CURRENT EXECUTION PROTOCOL PLACES A SUBSTANTIAL BURDEN ON MR. ATWOOD'S EXERCISE OF A SINCERELY HELD RELIGIOUS BELIEF AND IS NOT THE LEAST RESTRICTIVE MEANS OF FURTHERING A COMPELLING GOVERNMENT INTEREST, THUS VIOLATING RLUIPA.**

54. Mr. Atwood hereby realleges and incorporates by reference the preceding paragraphs in this Complaint.

55. Congress enacted RLUIPA "to accord religious exercise heightened protection from government-imposed burdens, consistent with" Supreme Court precedents. *Cutter v. Wilkinson*, 544 U.S. 709, 714 (2005). Under the statute, ADCRR must not impose a substantial burden on Mr. Atwood's religious exercise unless the restriction "(A) is in furtherance of a

compelling governmental interest; and (B) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C.A. § 2000cc (a)(1). When the state puts "substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists." *Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.*, 450 U.S. 707, 718 (1981). Once Mr. Atwood shows that his religious exercise was burdened, ADCRR "must prove its actions were the least restrictive means of furthering a compelling governmental interest." *Walker v. Beard*, 789 F.3d 1125, 1134 (9th Cir. 2015). A governmental action is the least restrictive alternative when there is "an 'exact fit' between the potential harm and the challenged state action." *Id.* at 1137.

56. Mr. Atwood has a sincere, longstanding and deeply held faith in Christianity, and specifically Greek Orthodoxy. Fr. Paisios has been his priest and spiritual advisor for over two decades, physically ministering to him throughout those many years.

57. Mr. Atwood's faith requires him to receive Greek Orthodoxy's last rites at the time of his death. In his ancient faith, this requires the physical presence of his priest who can touch him while praying and speaking to him. While RLUIPA protects "any exercise of religion, whether or not compelled by, or central to, a system of religious belief," §2000cc-5(7)(A), this longstanding traditional exercise of religion, practiced in the crucial moment when the faithful are about to meet their death, is both. *Cf. Ramirez,* Slip Op. at 12-14.

58. Proceeding under ADCRR's current Execution Protocol that denies Mr. Atwood the ability to have Fr. Paisios with him in the execution chamber to administer the last rites, put his hands on Mr. Atwood, and pray and speak to him aloud, coming as it would in the crucial last moments of Mr. Atwood's life on earth, would place a substantial burden on the exercise of his sincerely held religious beliefs.

59. Proceeding under ADCRR's current Execution Protocol that denies Mr. Atwood

the ability to have Fr. Paisios present with him in the execution chamber to administer the last rites, put his hands on Mr. Atwood, and pray and speak to him aloud, does not meaningfully advance any government interest, let alone a compelling one.

60. To the extent applying this burden to Mr. Atwood does advance some compelling government interest, using a protocol with a blanket policy excluding spiritual advisors from the execution chamber is not the least restrictive means of doing so.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Frank Jarvis Atwood prays that the Court provide relief as follows:

1. A declaratory judgment or other order that the defendants' conduct, through ADCRR's policy, is in violation of Mr. Atwood's rights under the First Amendment's Establishment and/or Free Exercise Clauses;

2. A declaratory judgment or other order that defendants' conduct, through ADCRR's policy, is in violation of Mr. Atwood's rights under RLUIPA;

3. An injunction ordering defendants and ADCRR to accommodate fully Mr. Atwood's religious exercise by permitting his spiritual advisor to be physically proximate at the time of his execution and able to place hands upon Mr. Atwood and speak directly to him in the administering of last rites under the Greek Orthodox faith;

4. An injunction or other order enjoining defendants and ADCRR and any and all other agents or employees of ADCRR from executing Mr. Atwood without a valid Execution Protocol that accommodates his exercise of religion;

5. Should the Arizona Supreme Court grant the State's motion for an execution warrant against Mr. Atwood, pursuant to the pending such motion or a future such motion during the pendency of these federal proceedings, an order:

    (a) requiring ADCRR to establish expressly by lawful amendment to its Execution Protocol the specific means by which ADCRR shall accommodate Mr. Atwood's religious exercise in relation to the physical presence and permitted conduct of his spiritual advisor within ADCRR's execution chamber; and

    (b) staying any such execution warrant or otherwise enjoining ADCRR from executing Mr. Atwood under any future execution warrant until (i) ADCRR

15

establishes by expressly amending its Execution Protocol, in accordance with the U.S. Constitution, RLUIPA, and federal law, to permit Mr. Atwood to physically access his spiritual advisor within ADCRR's execution chamber consistent with his religious practices and beliefs, and (ii) this Court, following a hearing and fact finding, confirms in a declaratory judgment that ADCRR's Execution Protocol as amended complies with this enumerated item of Mr. Atwood's prayer for relief (*viz.*, 5.(b)(1)); and

6. Other such relief as this Court deems proper and just.

DATED this 13th day of April, 2022.

/s/ *Joseph J. Perkovich*
JOSEPH J. PERKOVICH

AMY P. KNIGHT
Attorneys for Frank Jarvis Atwood